ADELAIDE C. MAXFIELD v. MAURICE AUERBACH.[1]

February 13, 1895.

No. 9177.

New Trial—Review on Appeal.

Held, under the rule of Hicks v. Stone, 13 Minn. 398 (434), the evidence was not so manifestly and palpably in favor of the verdict that it was error to set it aside and grant a new trial.

Appeal by plaintiff from an order of the district court for Ramsey county, Kelly, J., granting defendant's motion for a new trial. Affirmed.

*John F. Fitzpatrick,* for appellant.
*Stevens, O'Brien, Cole & Albrecht,* for respondent.

CANTY, J. This action is brought to recover the amount of a duebill for $1,250, made and delivered by defendant to one L. H. Maxfield, who thereafter died. Administration was taken out on his estate, and this duebill was assigned by the probate court to plaintiff. The duebill was given for the purchase price of 100

[1] Reported in 62 N. W. 284.

shares of stock in the Northwestern Autographic Register Company, a corporation, which stock was purchased by defendant of Maxfield. The defendant set up as a defense that he was induced to purchase the stock by means of false representation made to him by Maxfield with intent to deceive and defraud him, and on which he relied, and, upon discovering the fraud, he rescinded the contract, and tendered back the stock. The jury found a verdict for plaintiff for the amount claimed; the trial court granted defendant's motion for a new trial; and plaintiff appeals. The order was granted on the ground that the verdict was against the evidence. We cannot go into the evidence in detail, but are clearly of the opinion that the evidence was not so manifestly and palpably in favor of the verdict that the order granting a new trial should be reversed, under the rule laid down in Hicks v. Stone, 13 Minn. 398 (434), and cases following the same.

The capital stock of the corporation in question was $300,000; or 6,000 shares of $50 each; while its only assets were $10,000 in cash, and the right to procure from a certain New York corporation the registers made by it under patents, and used in mercantile establishments in registering accounts, and rent them in this state, Iowa, North and South Dakota, Wyoming, and a part of Wisconsin. There was evidence tending to show that this right was of no great value. Maxfield prepared and published an advertisement in which he stated, among other things, that said capital stock of $300,000 was all paid in; and that a similar corporation was organized for the same purpose, and was doing business on the same plan, in Chicago, and that, after six months' transactions, its books were examined by the bank examiner of Illinois, an expert, who discovered that in that time the company had earned $7\frac{2}{3}$ per cent. on its capital stock of $250,000. There was evidence tending to show that defendant had read this advertisement before purchasing the stock. Maxfield then prepared a subscription list, by the terms of which he agreed to sell, and the other subscribers thereto agreed to purchase, for $25 per share, the number of shares set opposite their respective names, of the stock of said first-named corporation. The first two subscribers are one Driscoll and one Schurmeier. There is evidence tending to show that they signed for 200 shares each at this price, and that Maxfield then erased the price of $25

per share, and substituted that of $12.50 per share, and erased the 200 shares in each case, and substituted 400 shares, all without the consent of these two subscribers; that he then presented the subscription list to defendant, who subscribed for 100 shares. There is evidence tending to prove that, before defendant so subscribed, Maxfield represented to him that Driscoll and Schurmeier had investigated the machine, and had subscribed as appeared by the paper, and that defendant was offered the opportunity to subscribe on the same footing, while in fact there was a secret agreement between Maxfield, and each of said first two subscribers that each should pay for but 100 shares of stock, at $12.50 per share. The testimony of Driscoll and Schurmeier is unsatisfactory as to what the exact agreement of each of them was with Maxfield, but each testifies that he paid Maxfield $1,250, for 100 shares, and no more. But, in the deposition of Maxfield taken in another case a short time before his death, he testified that he sold Driscoll and Schurmeier 100 shares each, at $12.50 per share, and gave them 100 shares each "for nothing." There is also evidence tending to prove that Maxfield at the same time represented to defendant that said Chicago company had made a dividend of 7 per cent. on its stock, while in fact it had made only 2 per cent. There was evidence tending to prove that these artifices were practiced and these representations made by Maxfield with intent to defraud, and that defendant believed them, relied on them, and was induced by them to purchase the stock. How strong and conclusive this evidence was it is not necessary here to discuss. Most of this evidence was uncontradicted, and, if Maxfield was not dead, it would perhaps be conclusive against the verdict. It was certainly sufficient, under the rule we have stated, to prevent the order granting a new trial from being reversed.

Order affirmed.